433 So.2d 549 (1983)
C.Y. TYSON, a/k/a Chester J. Tyson, and Eleanor A. Tyson, Appellants,
v.
Robert B. EDWARDS, et al., Appellees.
No. 81-949.
District Court of Appeal of Florida, Fifth District.
May 12, 1983.
Rehearing Denied June 21, 1983.
*550 R. Stephen Miles, Jr., of Miles & Cumbie, P.A., St. Cloud, for appellants.
David M. Landis of Lawrence, Griffin & Landis, Orlando, for appellees.
COWART, Judge.
When there is a discrepancy as to the location of the boundary of a surveyed lot of land between the monuments placed on the ground by the original surveyor and the written plat of that survey, which controls?
Long ago a large number of government sections of land were subdivided by the Narcoossee Farm and Townsite Company with each government section of 640 acres generally divided into 64 square lots of about 10 acres each less roadways and with some irregular lots caused by lakes and the prior subdivision of adjoining lands. In this scheme, of course, the section lines and quarter section lines would appear to fall on lines between lots or in the center of roads. However, the plat shows many undimensioned lines and the exact location of the government sections are not shown.
The boundary line dispute here is between the south line of Lots 32 and 33, Section 5, Township 25 South, Range 31 East, according to the New Map of Narcoossee as filed and recorded in Plat Book 1, Pages 73 and 74, Osceola County, Florida (which lots are owned by appellants), and the north line of Lot 24, Section 8, Township 25 South, Range 31 East, according to the same map (which lot is owned by appellees). The east-west boundary line in dispute (between Lots 32 and 33 to the north and Lot 24 to the south) is shown on the New Map of Narcoossee to be an east-west extension of the same boundary line which, across the road and to the east, is the south line of Lot 14 (Section 4) and the north lines of Lots 1 and 2 (Section 9). Lots 1 and 2 (Section 9) as well as the lots south of them (Lots 20 and 21, Section 9) were actually platted and occupied before the New Map of Narcoossee was made. However, the north boundary of Lots 1 and 2 was originally located, occupied and fenced on the ground at a point now established to be 380 feet north of what is now recognized as the true location of the section line between Sections 4 and 5 on the north and Sections 8 and 9 on the south. Of course, according to the plat of the New Map of Narcoossee the north boundary of Lots 1 and 2 would appear to be the section line between these sections. Likewise, according to the same plat, the lot boundary line in dispute in this case would appear to be the same section line. Owners of the next 5 lots north of Lots 1 and 2 as well as other lot owners in the subdivision, including appellees' predecessors in title took occupancy according to the occupancy of Lots 1 and 2, all being 380 feet north of their location as measured from what is now recognized as the true location of the section line. The result of this was that the location of many lots, as established by ground monuments and actual occupancy, was moved north and two odd-shaped double sized lots (Lots 9 and 16, Section 4) located about three-fourths of a mile north of the line disputed in this case and acreage immediately north of lots 32 and 33, was squeezed or shortened by the 380 foot difference between the location of the property lines on the ground and their paper location if located solely according to the New Map of Narcoossee and the now known and accepted location of the government section line.
The difference between the location of the disputed lot boundary as shown by the plat and as it was established on the ground by monuments and occupancy is illustrated by the following sketch:
*551 
Therefore, it is obvious from the undisputed facts in this case that, as to many lots in this subdivision, including those in question, there is a 380 foot north-south discrepancy between where, from the plat, it is apparent that the original surveyor intended lots to be with relationship to the true location of the government section lines in this area between Sections 4 and 5 to the north and Sections 8 and 9 to the south, and where the original surveyor actually laid out and monumented the boundaries of these lots on the ground. It is further obvious that at least some of the lot owners who subsequently purchased lands by reference to the plat took occupancy according to the monuments on the ground.
In this case appellants claim to a lot boundary line that is correct according to the apparent intention of the original surveyor and appellees claim to a lot boundary line that is consistent with lot lines established by the original surveyor on the ground and occupied by owners. Thus, a classic boundary line question is presented. Technically the question is:
Where an original surveyor subdivides and lays out boundaries of parcels in a tract of land which has theretofore existed as a single unit and runs lines and places monuments establishing the location of the subdivided parcels or plots or lots on the ground and the surveyor draws a plat of survey or written map of his work which is recorded and subsequently one or more parcels are conveyed by deed describing the parcels according to such plat of survey and some parcels are sold according to the plat but purchasers take actual possession according to the survey as monumented on the ground and there is a discrepancy and conflict between the location of parcels as located by the original survey on the ground and as they are shown to be located according to the recorded plat, is the correct legal location of a particular parcel *552 as it was actually originally located and possession taken on the ground or is it as can now be located by following only the intent revealed by the recorded plat?
More simply put the question is:
In the event of a discrepancy as to subdivided land lot lines, do you go with what the original surveyor intended to do as shown by the plat or do you go with what the original surveyor did by way of laying out and monumenting his survey on the ground?
Surprisingly, because of surveying principles based on established surveying practices, the correct answer is that what the original surveyor actually did by way of monumenting his survey on the ground takes precedence over what he intended to do as shown by his written plat of survey.
The difficulty with the problem is that the role and practice of the surveyor and his function in solving a surveying problem of the type in this case is misunderstood. Lawyers, architects and design engineers are accustomed to achieving objectives by first conceiving of abstract ideas or plans, then reducing those ideas (intentions) to paper, and then using the written document from which to construct a physical object or otherwise tangibly achieve the original goal as written. When this is done, the written document is always considered authoritative and any deviation or discrepancy between it and what is actually done pursuant to it is resolved by considering the deviations and discrepancies as being defects or errors in the execution of the original plan to be corrected by changing the physical to conform to the intention evidenced by the writing. In only one situation does the surveyor play a similar role and that is when he, in the first instance, lays out boundaries in the original division of a tract which has theretofore existed as a single unit. Thereafter the surveyor's function radically changes. It is not the surveyor's right or responsibility to set up new points and lines establishing boundaries except when he is surveying theretofore unplatted land or subdividing a new tract. Where title to land has been established under a previous survey, the sole duty of all subsequent or following surveyors is to locate the points and lines of the original survey. Later surveyors must only track and "trace the footsteps" of the original surveyor in locating existing boundaries. They cannot establish a new corner or line nor can they correct erroneous surveys of earlier surveyors, even when the earlier surveyor obviously erred in following some apparent original "over-all design" or objective. The reason for this lies in the historic development of the concept of land boundaries and of the profession of surveying. Man set monuments as landmarks before he invented paper and still today the true survey is what the original surveyor did on the ground by way of fixing boundaries by setting monuments and running lines ("metes and bounds"), and the paper "survey" or plat of survey is intended only as a map of what is on the ground. The surveying method is to establish boundaries by running lines and fixing monuments on the ground while making field notes of such acts. From the field notes, plats of survey or "maps" are later drawn to depict that which was done on the ground. In establishing the original boundary on the ground the original surveyor is conclusively presumed to have been correct and if later surveyors find there is error in the locations, measurements or otherwise, such error is the error of the last surveyor. Likewise, boundaries originally located and set (right, wrong, good or bad) are primary and controlling when inconsistent with plats purporting to portray the survey and later notions as to what the original subdivider or surveyor intended to be doing or as to where later surveyors, working, perhaps, under better conditions and more accurately with better equipment, would locate the boundary solely by using the plat as a guide or plan. Written plats are not construction plans to be followed to correctly reestablish monuments and boundaries. They are "as built" drawings of what has already occurred on the ground and are properly used only to the extent they are helpful in finding and retracing the original survey which they are intended to describe; and to the *553 extent that the original surveyor's lines and monuments on the ground are established by other evidence and are inconsistent with the lines on the plat of survey, the plat is to be disregarded. When evidence establishes a discrepancy between the location on the ground of the original boundary survey and the written plat of that survey the discrepancy is always resolved against the plat.
From a correct surveying viewpoint it is immaterial that it may be "clear and apparent from an examination of the plat" that the original intent and overall design or plan was to subdivide sections along lines that would have placed the disputed boundary line on the section line between Sections 5 and 8. The lots in question are not government lots laid out by the original government surveyor to subdivide irregular government sections, as is sometimes done.[1] These lots were laid out and created by a private surveyor for the Narcoossee Farm and Townsite Company. The problem here is, perhaps, confused by the fact that rather than giving each lot in the subdivision a different number or, what is more common, dividing groups of lots into lettered or numbered blocks, which permits the duplication of lot numbers in different blocks, here the original surveyor treated each government section as a block and duplicated the lot numbers in each section. This necessitated a reference to the government section in describing the lot by reference to the plat as distinguished from describing each lot by a metes and bounds description or consecutively numbering all lots or using numbered or letter blocks of lots. Nevertheless the lots in question were actually established by their own monuments and occupancy on the ground and the government section line and its location is immaterial to the proper inquiry as is the original government survey and field notes of the government survey locating the section line.
Appellants' position depends on three assertions with which we cannot agree, viz: (1) That when there is a discrepancy between the original survey on the ground and the plat drawn to illustrate that survey, the intent of the surveyor as gleaned from the plat should govern over the boundaries and lines physically located by the surveyor on the ground; (2) that the survey erroneously locating the lot boundary on the ground in this case was made subsequent to the drawn plat; and (3) that the real disputed property boundary line in this case is the government section line between Section 5 and Section 8 and not the privately surveyed boundary line between Lots 32 and 33 to the north and Lot 24 to the south as shown on the New Map of Narcoossee. If the disputed line was truly that between Section 5 and Section 8 then the government survey that first laid out Township 25 South, Range 31 East, into the 36 sections that contain Section 5 and Section 8 would be the original survey in question. However, the boundary line here in dispute is the boundary between lots first laid out by the private surveyor whose survey work on the ground is depicted on the plat known as the New Map of Narcoossee. In this case, the private surveyor, not the government surveyor, laid out lots according to the New Map of Narcoossee, and the private surveyor is the original surveyor whose footsteps on the ground must be followed by all following surveyors. Just as the monuments evidencing the line between Sections 5 and 8 (and Sections 4 and 9) are now there on the ground; likewise, the monuments set by the original survey to evidence the line between Lots 32 and 33 to the north and Lot 24 to the south was, based on evidence presented, found by the trial court to be there on the ground, but at a different location than the monuments establishing the line between Section 5 and Section 8. In this particular case, it is only incidental that the disputed boundary line between Lots 32 and 33 to the north and Lot 24 to the south, happens to be shown on the Map of Narcoossee (but not as located on the ground), as being at the same point as the now undisputed boundary line shown on the government survey of Township 25 South, Range 31 East, to be between Section 5 and *554 Section 8. The survey problem in this case, and its proper solution, would be exactly the same as to the discrepancy that also exists between the location on the ground and the location which is shown on the recorded plat of New Map of Narcoossee as the lot boundary lies between Lots 13 and 14, 13 and 12, 12 and 11, 11 and 10, and between the north line of Lot 10 and the south line of Lots 9 and 16, Section 4, New Map of Narcoossee (as shown on the two sketches above), although according to the New Map of Narcoossee those lot lines are not shown to be coextensive with any government section lines. According to the testimony of Mr. Johnston, the surveying problem caused by this discrepancy between the original survey and the original plat of the "Old" and New Map of Narcoossee stops at this point because occupancy on the ground of acreage north of Lots 32 and 33 has absorbed this 380-foot error, as have Lots 9 and 16 in Section 4. Therefore, there is an easy escape from the horns of the dilemma and of a forced choice between the two alternatives of upholding the trial judge's application of good general law to the facts of this particular case, and the specter of this case re-drawing all of the internal east-west subdivision lines of the entire Section 5.[2]
Bishop v. Johnson, 100 So.2d 817 (Fla. 1st DCA 1958), cert. denied, 104 So.2d 596 (Fla. 1958), differs from this case in two material particulars. First, Bishop involved the somewhat unusual case where the original government surveyor not only subdivided the township into sections but, further, platted and subdivided the section in question into government lots. See note 1 infra. Therefore, unlike this case, the original government survey establishing the section boundaries was also the original survey of the lot lines involved in Bishop. More importantly, Bishop did not involve a discrepancy between the original survey and the depiction of that survey on the original plat, as is the problem in this case. In Bishop, it was assumed that the original government plat of survey correctly portrayed the original survey it purported to depict, and the problem was that a subsequent private survey did not follow the original survey but instead found a peninsula of land appended to a different section than that shown on the prior original government plat of survey. Since there was no suggestion of a discrepancy between the original government survey on the ground and the original government plat of that survey, the court in Bishop used the terms official government "survey" and "plat" as being the same and as being interchangeable. In that circumstance and case and context, and with that understanding, Bishop is exactly consistent with this opinion. We have only a semantical argument with Bishop in that the true survey line is always fixed by the original survey and not by the original plat which only attempts to picture or portray the actual survey work that has already been physically accomplished on the ground. When there is no discrepancy between the two, as in Bishop, the distinction is meaningless; *555 but when there is a discrepancy, as in this case, the difference is the problem and the original survey controls over the original plat. It is also immaterial that a "mistake" was made in originally setting the boundary which is shown as the north lines of Lots 1 and 2 in Section 9 on the New Map of Narcoossee although that fact explains why a similar mistake was originally made in setting the boundary line in question in this case because these two boundary lines are east-west extensions or projections of each other. However, it is likewise immaterial that a "mistake" was made in originally locating the boundary line in question on the ground and how or why that "mistake" was made.[3] In this case the "New" Map of Narcoossee is not the "original survey" for two reasons. The first is, as explained above, no written document is the "original survey" which term properly refers to the original surveying work locating and fixing the monuments and lines on the ground that constituted the original lot boundaries. Secondly, the New Map of Narcoossee, made about 1913, was not even the original plat of the original survey. At least in part it was merely a replatting and extension of an earlier survey, being the "Old" Map of Narcoossee, surveyed and platted about 1887. Similarly, the State Road Department survey of 1944 was merely a retracing survey. Mr. Hanson, appellants' surveyor, is incorrect in suggesting that the State Road Department survey caused the 380-foot "mistake" in locating the north line of Lots 1 and 2 in Section 9. The State Road Department survey correctly "followed" the original survey and, in keeping with proper surveying theory, found, accepted, adopted and re-documented the "mistakes" of the original surveyor in establishing the original boundaries (as shown by fences, possession and other evidence) including the mistake in putting the north line of Lots 1 and 2 at a point 380 feet north of the section line between Sections 4 and 9. Mr. Johnston, appellees' surveyor, is correct in his view that the original survey on the ground must be taken as correct and that the plat (New Map of Narcoossee) is in error and that the later SRD survey is correct in following the original ground survey and not following the original plat.
As was said in Akin v. Godwin, 49 So.2d 604, 607 (Fla. 1950):
In making a resurvey, the question is not where an entirely accurate survey would locate the lines, but where did the original survey locate such lines.
This case does not involve boundaries established or affected by adverse possession (the statute of limitations), agreement or acquiescence. Neither does this case involve the entirely different and distinct surveying problem of properly apportioning an excess or deficiency of certain lines or tracts shown by recent measurements as compared with the original measurements.[4]
In a case such as this, the overall legal problem may be to establish and fix the legal boundary between two parcels of land, but the surveying problem is only to locate the boundary established on the ground by the original surveyor and is not to either establish a new boundary line where the plat shows one or to determine if the original surveyor erred in carrying out his work. Since as to contracts, wills, construction plans, etc., the writing is evidence of some preexisting human intent, and legal work is *556 largely concerned with the original intention of the scrivener, it is sometimes difficult for the legally trained mind to think otherwise as to plats and to understand the surveying problem and the proper surveying approach to, and solution of, it.
The result of all of this is that most boundary disputes essentially present a surveying problem and the surveying profession has its own rules, methods and practices for resolving its problems.[5] Neither the legal nor surveying problem in a boundary dispute involves a question of what the original subdivider or surveyor intended or where, on the ground, a boundary should now be established to conform to the plat. The question is where on the ground the original surveyor did in fact fix the particular boundary and not where he intended, or should have, fixed it. Neither at trial nor on appeal can that question be answered by legal deductive reasoning or by analogy to holdings in other law cases involving disputed land boundaries. The legal problem at trial is more simple than the surveying problem and is the common problem of resolving a question of fact as to the location on the ground of the original surveyor's lines and monuments locating the boundary in question. The legal problem on appeal in such a case is even more simple. Where, as here, there is ample substantial competent evidence in the record to support the finding of the trial judge, as the finder of the fact question in the case, his finding comes to the appellate court clothed with a welldeserved presumption of correctness[6] and he should be, and his final judgment in this case is,
AFFIRMED.
FRANK D. UPCHURCH, Jr., concurs.
SHARP, dissents with opinion.
SHARP, Judge, dissenting.
I dissent in this case because there was no discrepancy between the original survey and the recorded plat as regards the particular lots in question: lots 32 and 33, section 5 and Lot 24, section 8. The dispute is illustrated by the following diagram:

*557 The plat was a "grid" superimposed on eight sections of land arranged as follows:

 ----------------------
 | 6 | 5 | 4 | 3 |
 |-----|-----|-----|----|
 | 7 | 8 | 9 | 10 |
 ----------------------

Each section was subdivided into sixty-four equal squares with a dimension of 655.5 feet north to south. Between every two tiers of lots appear platted roads, which coincide with the north-south section lines and quarter section lines. There are also platted roads running east to west along the section and quarter-section lines. In this case there was no question about locating the old section lines, because the section monuments are there on the ground. Although the original surveyor's notes and stakes cannot be found, a mere look at the plat impels the conclusion that this grid or plan was intended to be based on section lines. Cf. Tyner v. McDonald, 63 So.2d 504 (Fla. 1953).
Further, it is possible in this case to carry out the plan of the plat because there is enough land in these sections to do so. Craig v. Russell, 141 Fla. 105, 192 So. 457 (1939). In Froscher v. Fuchs, 130 So.2d 300 (Fla. 3d DCA 1961), there was a fifty foot shortage in the plat because the section line fell in the middle of a canal, and there was not enough land left in the section to give each lot the dimensions shown on the plat.
I think this case is analogous to Akin v. Godwin, 49 So.2d 604 (Fla. 1950). Akin held that the original plat cannot be altered by a later resurvey.
The original survey in all cases must, whenever possible, be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it.
Id. at 607.
In this case an error occurred, many years after the plat was recorded, in locating the north boundary of lots 1 and 2 some 380 feet north of the section line. These lots are in the section immediately east of the lots involved in this case, and apparently fences and occupation rights have cemented that error for those lots. There are no similar fence or occupation lines regarding the lots involved in this suit, however.
In addition, the State Road Department map, made long after the plat was recorded, also located the north boundary of lots 1 and 2 380 feet north of the section line. Later surveyors following that map and the fence line on lots 1 and 2, located all the lots in that tier, as well as the lot lines for the tiers involved in this suit 380 feet north of the section and quarter section lines. Mr. Johnston, appellee's expert, testified that the northernmost lots in section 5 had not been pushed north over the county line into Orange County because lots 9 and 16 had been squeezed or shortened by some 380 feet. He agreed a mistake had been made, but he maintained the plat was in error, not the later maps and surveys. The majority opinion in this case agrees with Mr. Johnston.
I cannot accept Mr. Johnston's view. It is a well established principle in Florida's real estate law that a later survey cannot alter an original recorded plat absent some exceptions which do not apply in this case.
A resurvey that purports to change lines or distances or to otherwise correct inaccuracies and mistakes in an old plat is not competent evidence of the true line fixed by the original plat.
Bishop v. Johnson, 100 So.2d 817, 820 (Fla. 1st DCA 1958), cert. denied, 104 So.2d 596 (Fla. 1958). Here that is precisely what has happened. An error in a State Road Department map, and later (post-plat) surveys have altered the straight lines platted for section 5. The plat, as redrawn by this case, will now look something like this:
*558 
instead of as it appears of record. An interesting question is how far this wrinkle, erroneously caused by a survey subsequent to the plat, will be allowed to warp the rest of the grid.
NOTES
[1] See, for example, the government plat of lots in Bishop v. Johnson, 100 So.2d 817 (Fla. 1st DCA 1958), cert. denied, 104 So.2d 596 (Fla. 1958).
[2] The suggestion that this case constitutes a wholesale redrawing of all east-west lot lines in Section 5 is an example of the use of reductio ad absurdum or indirect proof which is a special case of the use of the method of conditional proof to test truth value in propositional logic, wherein the negation of a conclusion is asserted as an assumed premise and then an attempt is made to derive a contradiction from it, which in turn is used to derive the conclusion of the argument schema. This deductive proof system does not provide a decision-making procedure here. The majority opinion follows a rule of law to the effect that when there is a discrepancy between a surveyed land boundary line as monumented on the ground and as shown on a plat depicting that survey, the law treats the law on the ground as correct and disregards the contradictory plat once owners have bought and taken possession on the ground in accordance with the property lines as monumented on the ground. The assumption that the application of the rationale of this rule of law will require the "redrawing" of all east-west lot lines in Section 5 is fallacious. Even if it were true, it is far better to redraw lines on a piece of paper to make them consistent with occupancy on the ground than to uproot and move all of the property owners who have in good faith erected homes, fences and other improvements in conformity with monuments on the ground, in order to make their actual occupancy and possession conform to what is erroneously shown on a piece of paper recorded in the courthouse.
[3] Apparently the surveyor in 1913, in staking out on the ground the lots in this area, erroneously assumed that Lots 1 and 2 in Section 4 as monumented, occupied and fenced on the ground were in the correct location as shown on the earlier (1887) plat; that is, that their north line was at the true location of the section line when in reality the location of their north line was actually 380 feet north of the section line. Therefore, measuring on the ground from those lots the surveyor laid and staked out the boundaries of lots to the north and to the west, including the lots whose boundaries are here in litigation, 380 feet north of where they are depicted on his plat. Therefore, as distinguished from the situation in Tyner v. McDonald, 63 So.2d 504 (Fla. 1953), here there is a conflict between the plat and the survey.
[4] See J. Grimes, A Treatise on the Law of Surveying and Boundaries §§ 233-256 (4th Ed. 1976).
[5] See generally J. Grimes, A Treatise on the Law of Surveying and Boundaries §§ 8-23, §§ 275-300 (4th Ed. 1976).
[6] See Akin v. Godwin, 49 So.2d 604 (Fla. 1950); Trustees of the Internal Improvement Fund v. Wetstone, 209 So.2d 698 (Fla. 2d DCA 1968), cert. dism'd 222 So.2d 10 (Fla. 1969); Osborn v. King, 194 So.2d 912 (Fla. 2d DCA 1967); Guise v. Shuman, 188 So.2d 35 (Fla. 3d DCA 1966); Bittner v. Walsh, 132 So.2d 799 (Fla. 1st DCA 1961); Froscher v. Fuchs, 130 So.2d 300 (Fla. 3d DCA 1961).