539 So.2d 1147 (1989)
Harold J. RIVERS and Mary E. Rivers, Appellants/Cross-Appellees,
v.
Raymond S. LOZEAU and Joy Elaine Lozeau, His Wife, Appellees/Cross-Appellants.
No. 88-396.
District Court of Appeal of Florida, Fifth District.
February 23, 1989.
Rehearing Denied March 23, 1989.
*1148 Bryce W. Ackerman of Savage, Krim, Simons, Fuller & Ackerman, P.A., Ocala, for appellants/cross-appellees.
H. Randolph Klein of Klein & Klein, Ocala, for appellees/cross-appellants.
*1149 COWART, Judge.
This is a land boundary line dispute case.
THE FACTS The controversy in this case involves the correct location of the line between two parcels of land lying within the 40 acre quarter-quarter section described as the Southeast 1/4 of the Southwest 1/4 of Section 15, Township 14 South, Range 24 East, in Marion County, Florida. In 1964 Joseph Rizzo and his wife owned that portion of this quarter-quarter section that is in question. The U.S. Forestry Service owns the land to the north. At that time, the Rizzos retained a surveyor, Moorhead Engineering, to survey their land and to establish certain internal land lines dividing it into parts. Moorhead undertook to locate and monument Rizzos' external boundary lines and corners and to establish and monument the terminal points of certain internal division lines.
In 1969, the Rizzos conveyed to Marcus E. Brown and wife by deed containing the following land description:
The North 400.00 feet of SE 1/4 of SW 1/4 of Section 15, Township 14 South, Range 24 East, Marion County, Florida.
The west, north, and east lines of the Brown parcel followed the outer or external boundary lines of the property owned by the Rizzos. The south line of the Brown parcel did not follow any internal line established by the Moorhead survey. Mr. Rizzo showed Marcus Brown the monuments Moorhead had set as being the north corners of this quarter-quarter section and certain other Moorhead monuments which the Rizzos told Marcus Brown were 33 feet south of the south line of the parcel the Rizzos conveyed to Brown. Later in 1977 or 1978, Marcus Brown measured 33 feet north of the Moorhead monuments shown him by Mr. Rizzo and placed a metal rod at the point Mr. Rizzo had told him was his south boundary line. Marcus Brown conveyed this property by the same description to George Brown who conveyed by the same description to appellees Raymond S. Lozeau and his wife.
In 1975, the Rizzos conveyed a parcel of their remaining land to Paul W. Adams and wife, which parcel was described by reference to the boundary lines of this quarter-quarter section with the north line of the property conveyed being described as
thence N 89 53'01" E. along a line 400.00 feet south of and parallel to the North line of said SE 1/4 of SW 1/4 a distance of 1327.04 feet to a point on the East line of said SE 1/4 of SW 1/4;
Using substantially the same land description, the Adamses conveyed to Daniel E. Reader and wife, who conveyed to appellants Harold J. Rivers and wife.
In 1982 the U.S. Bureau of Land Management did a "dependent resurvey" of the lands of the U.S. Forestry Service which retraced the lines of the original government survey and identified, restored, and remonumented the original position of the corners of the original U.S. government survey.[1] This remonumenting of the original government survey, along with a 1986 survey by Whit Holley Britt, made obvious to all the true location of the north line of this quarter-quarter section on the ground and that the Moorhead monuments intended to denote that line were actually located 28.71 feet north of the true location of that line as it was originally established by the official U.S. government survey and reestablished by the 1982 government "dependent survey."
Appellees Lozeaus brought this action in ejectment and for declaratory judgment against the appellants Riverses who had possession of the south 28.71 feet of the north 400 feet measured from the north line of the quarter-quarter section according to the U.S. government (and Britt) surveys. The Lozeaus argued that they acquired legal title to the disputed land by virtue of the 1969 deed from Rizzo to Marcus Brown and the successive conveyances to them. The Riverses argued that Moorhead was the original surveyor and that his monuments on the ground controlled the *1150 location of the land subsequently conveyed by Rizzo, notwithstanding that "later" surveys, i.e., the government survey of 1982 and the 1986 Britt survey, may show the Moorhead monuments to have been in error.[2] After a non-jury trial, the trial court found that the property descriptions of the parties overlapped and ordered that the exact dimensions of the overlap be established and the overlapping property split evenly between the plaintiffs and defendants. The Riverses appeal and the Lozeaus cross-appeal.
LAND DESCRIPTIONS Since time immemorial, parcels of land have been identified and described by reference to a series of lines or "calls" or "courses" that connect to completely encircle the perimeter or boundaries of a particular parcel. A particular property description may consist entirely of descriptions of original lines that compose it or it may, in whole or in part, refer to other sources which themselves show or describe previously surveyed and existing lines or calls. An individual line or call in a property description usually, but not always,[3] refers to an imaginary straight line customarily described in several ways: (1) by reference to its length, (2) by reference to its terminal points (commonly called "corners" or "angles"), (3) by reference to its angle with regard to true north, magnetic north, or to one or more other lines. A property description composed of descriptions of its constituent boundary lines or calls is known as a "metes and bounds" description. Of the ways that boundary lines are described, the reference to terminal points is the strongest and controls when inconsistent with other references.[4] In effect, real property descriptions are controlled by the descriptions of their boundary lines which are themselves controlled by the terminal points or corners as established on the ground by the original surveyor creating those lines. A property description that refers to, and adopts by reference, the description of a boundary line is DEPENDENT upon the proper location of the adopted line, which is dependent upon the location of the terminal points of the adopted line, which are dependent on their location on the ground as established by the original surveyor creating that adopted line.
LAND SURVEYORS Although title attorneys and others who regularly work with them develop expertise as to land descriptions, the only professional authorized to locate land lines on the ground is a registered land surveyor.[5] In fact, the definition of a legally sufficient real property description is one that can be located on the ground by a surveyor. However, in the absence of statute, a surveyor is not an official and has no authority to establish boundaries; like an attorney speaking on a legal question, he can only state or express his professional opinion as to surveying questions. In working for a client, a surveyor basically performs two distinctly different roles or functions:
First, the surveyor can, in the first instance, lay out or establish boundary lines within an original division of a tract of land which has theretofore existed as one unit or parcel. In performing this function, he is known as the "original surveyor" and when his survey results in a property description used by the owner to transfer *1151 title to property[6] that survey has a certain special authority in that the monuments set by the original surveyor on the ground control over discrepancies within the total parcel description and, more importantly, control over all subsequent surveys attempting to locate the same line.
Second, a surveyor can be retained to locate on the ground a boundary line which has theretofore been established. When he does this, he "traces the footsteps" of the "original surveyor" in locating existing boundaries. Correctly stated, this is a "retracement" survey, not a resurvey, and in performing this function, the second and each succeeding surveyor is a "following" or "tracing" surveyor and his sole duty, function and power is to locate on the ground the boundaries corners and boundary line or lines established by the original survey; he cannot establish a new corner or new line terminal point, nor may he correct errors of the original surveyor. He must only track the footsteps of the original surveyor. The following surveyor, rather than being the creator of the boundary line, is only its discoverer and is only that when he correctly locates it.[7]
ORIGINAL LAND LINES When there is a boundary dispute caused by an ambiguity in the property description in a deed, it is often stated that the courts seek to effectuate the intent of the parties. This is not an accurate notion. The intent of the parties to a contract for the sale and purchase of land, both the buyer and the seller, may be relevant to a dispute concerning that contract, but in a real sense, the grantee in a deed is not a party to the deed, he does not sign it and his intent as to the quality of the legal title he receives and as to the location and extent of the land legally conveyed by the deed is quite immaterial as to those matters. The owner of a parcel of land, being the grantee under a patent or deed, or devisee under a will or the heir of a prior owner, has no authority or power to establish the boundaries of the land he owns; he has only the power to establish the division or boundary line between parcels when he owns the land on both sides of the boundary line he is establishing. In short, an original surveyor can establish an original boundary line only for an owner who owns the land on both sides of the line that is being established and that line becomes an authentic original line only when the owner makes a conveyance based on a description of the surveyed line[8] and has good legal title to the land described in his conveyance.
UNITED STATES AS ORIGINAL OWNER AND ITS CADASTRAL ENGINEER Subject only to certain rights of individuals under Spanish grants, the United States became the owner of all land now in the State of Florida by virtue of a treaty with Spain dated Feb. 22, 1819 and ratified Feb. 22, 1821 and, as original governmental owner, caused Florida to be surveyed in accordance with a rectangular system of surveys of public lands adopted by Acts of Congress. The permanent seat of government having been established at Tallahassee, an initial point of reference was located nearby through which a north-south guide line was run according to the true meridian and a base (township) line was run east-west on a true parallel of latitude.[9] North-south range lines, six miles apart and parallel to the Tallahassee Principal Meridian, were run throughout the state except where impracticable because of navigable waters, etc. Likewise, East-West township lines, six miles apart and parallel to the base line, were also run throughout the state to form normal townships six *1152 miles square each of which were divided into thirty-six square sections, one mile long on each side containing as nearly as may be, 640 acres each. These sections were numbered respectively, beginning with the number one, in the northeast corner and proceeding west (left) and east (right) alternately through the townships with progressive numbers. Sections were divided into squares of quarter sections containing 160 acres. The quarter-quarter section corners are placed on the line connecting the section and quarter-section corners, and midway between them. Although theoretically conceived and invisible, these lines are not merely theoretical concepts but are real lines, actually run and marked on the ground with terminal points monumented by surveyors acting under the authority of the cadastral engineer of the Bureau of Land Management. The approved and accepted boundary lines established by the federal government surveyors are unchangeable and control all references in deeds and other documents describing parcels of land by reference to the federal government of sections, townships and ranges.
THE LAW APPLIED TO THE FACTS OF THIS CASE In establishing the internal lines within Rizzo's subdivision, Moorhead acted as an "original surveyor" but in attempting to locate and monument Rizzo's external boundary lines which are described by reference to the federal rectangle system of surveying, Moorhead was a "following surveyor" and not only failed to properly find the northern boundary of this quarter-quarter section where it was located by the original government surveyor (and also re-established by an authorized federal government resurvey) but to evidence his erroneous opinion as to the true line, the Moorhead surveyor placed monuments 28.71 feet north of the true north line of this quarter-quarter section. From the time the federal government granted this quarter-quarter section to the original grantee down to the Rizzos, the title conveyed was to a tract of land located according to the original government survey and by the deed from the Rizzos to Brown, and subsequent deeds, the Lozeaus acquired title to the north 400 feet of this quarter-quarter section according to the true boundary line established by the original government surveyors. This is true regardless of the fact that Mr. Rizzo showed Marcus Brown the erroneous monuments set by the Moorhead surveyors[10] and regardless of where anyone erroneously thought or believed the correct location of this land boundary line to be. Neither the title to land nor the boundaries to a deeded parcel move about from time to time based on where someone, including a particular surveyor, might erroneously believe the correct location of the true boundary line to be. In 1975, the Rizzos conveyed to appellant Rivers' predecessor in title property the northern boundary *1153 of which is defined as being 400 feet south of, and parallel to, the north line of this quarter-quarter section. Regardless of any assertion that this conveyance was made relying on the Moorhead survey, the description itself does not describe the line in question by reference to the survey or monuments set by the Moorhead surveyor. On the contrary, that description adopts by reference the true north line of this quarter-quarter section which is necessarily controlled by the location of that line as established by the original government survey. Even if the description in the subsequent deed is considered to overlap the south 28 feet of the property previously conveyed by the Rizzos to Lozeaus' predecessor in title (which it does not), it is quite immaterial because, at the time of the conveyance to Paul W. Adams, Mr. and Mrs. Rizzo did not own that south 28 feet, they having previously conveyed legal title to it to Marcus Brown, Lozeaus' predecessor in title. All else argued in this case is immaterial. The Lozeaus are entitled to prevail in this controversy. All legal theories that could change the result in this case, such as those relating to adverse possession, title by acquiescence, estoppel, lack of legal title, etc., were neither asserted, nor argued, nor material in this case. This case is reversed and remanded with instructions that the trial court enter a judgment in favor of the appellees Raymond S. Lozeau and wife, in accordance with the land description as controlled by the official U.S. government survey.
REVERSED and REMANDED.
COBB, J., and GLICKSTEIN, H.S., Associate Judge, concur.
NOTES
[1] This is only a re-establishment of the true position of the original survey by retracement. Clark on Surveying and Boundaries, § 650 Dependent surveys, page 956, (Grimes 4th Ed. 1976).
[2] See Akin v. Godwin, 49 So.2d 604 (Fla. 1950); Willis v. Campbell, 500 So.2d 300 (Fla. 1st DCA 1986); Zwakhals v. Senft, 206 So.2d 62 (Fla. 4th DCA 1968); City of Pompano Beach v. Beatty, 177 So.2d 261 (Fla. 2d DCA 1965) and Froscher v. Fuchs, 130 So.2d 300 (Fla. 3d DCA 1961).
[3] Property descriptions sometimes refer to irregular natural lines capable of identification, such as the banks, shores, and high and low marks of bodies of water such as oceans, lakes, rivers and streams, and to the midtread of streams, the face of cliffs, the ridge of mountains, etc.
[4] In a similar manner, when there is an inconsistency between the description of a corner (a line terminal point) in field notes and plats subsequently made and recorded and the original monument evidencing that corner on the ground, the original monument on the ground controls. See Tyson v. Edwards, 433 So.2d 549 (Fla. 5th DCA 1983), rev. denied, 441 So.2d 633 (Fla. 1983).
[5] See § 472.005(3), Fla. Stat.
[6] This is a most important qualification.
[7] See Clark on Surveying and Boundaries, Chap. 14 Tracking a Survey, pg 339 and generally (Grimes 4th Ed. 1976).
[8] Neither the 1969 deed from the Rizzos to Marcus Brown nor the 1975 deed from the Rizzos to Paul W. Adams contains property descriptions of lines bounded by monuments set by surveyor Moorhead in 1964. This would be an entirely different case if the land descriptions in question described lines "commencing at (or running to) a concrete monument set in 1964 by surveyor Moorehead, etc."
[9] See § 258.08, Fla. Stat., and Fla. Stat.Annot., Vol. 1, page 119, (West 1961). Unfortunately, this helpful material has been omitted from the 1988 edition of this volume of F.S.A.
[10] Notwithstanding that Rizzo and Brown both may have subjectively believed or intended Rizzo's deed to Brown to convey the land between the erroneous Moorhead monuments, because the deed described land by reference to the U.S. government survey it conveyed the legal title to the north 400 feet of this quarter-quarter section as measured from the true location of the original government survey. To the extent that Rizzo's deed conveyed legal title to land Rizzo did not intend to convey, Rizzo's remedy would have been to have brought a reformation suit in equity to have his deed reformed to describe the correct parcel by a correct description. Of course, the resulting litigation can be easily visualized: Rizzo would claim that he and his grantee Marcus Brown intended Rizzo's deed to convey land only south to a point 33 feet north of one of Moorhead's monuments and his deed should be reformed accordingly. Brown would admit that was true but would then claim that the parties also obviously intended that Brown was to obtain property 400 feet wide from north to south and that Brown should either keep the 400 feet described in the deed or be entitled to obtain money damages from Rizzo or to rescind the transaction because of Rizzo's misrepresentation that he owned to the erroneous Moorhead monument located 28.71 feet north of Rizzo's true line and Rizzo did not own that northern 28.71 feet. These contentions, which never matured, existed only between the original parties and do not inure to any subsequent good faith purchasers who took legal title to their parcels according to the land descriptions contained therein, and the equitable and legal rights between Rizzo and Brown being personal to them are immaterial in litigation between subsequent owners.