DA 11-0490

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 46

GLEN AND JOHANNA WOHL,
et al.,

        Plaintiffs, Appellees and Cross-Appellants,

    v.

CITY OF MISSOULA and JOHN DOES 1-20,

        Defendants, Appellants, and Cross-Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Fourth Judicial District,<br>In and For the County of Missoula, Cause No. DV 05-389<br>Honorable Edward P. McLean, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

            Martin S. King; Worden Thane P.C.; Missoula, Montana

            Jim Nugent; Susan Aaberg Firth; City Attorney's Office; Missoula, Montana

        For Appellee:

            Thomas C. Orr; P. Mars Scott Law Offices; Missoula, Montana

Submitted on Briefs:  September 12, 2012

Decided:  February 26, 2013

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Plaintiffs are a group of landowners (Landowners[1]) who own properties abutting South Avenue in the City of Missoula.  The instant lawsuit arose out of a dispute between Landowners and the City concerning the width of the public right-of-way constituting South Avenue.  Following a bench trial, the Fourth Judicial District Court, Missoula County, determined that the right-of-way is 60 feet wide.  Therefore, because the City's recent improvements to South Avenue extend beyond this 60-foot parameter, the District Court concluded that the City had effected a taking of property.  The District Court awarded Landowners compensation for the taking, plus a portion of their requested costs and attorney's fees.  The City now appeals, and Landowners cross-appeal.

¶2      We consider the following issues:

1. Whether the District Court erred in determining that the City's right-of-way constituting South Avenue is limited to 60 feet in width.

2. Whether Landowners are entitled to compensation for a taking of property.

3. Whether the District Court applied an incorrect measure of compensation.

4. Whether Landowners may recover their costs and attorney's fees.

5. Whether the District Court abused its discretion in denying Landowners "fees for fees" and in directing counsel not to pass certain fees on to his clients.

6. Whether the District Court abused its discretion in denying Landowners damages and fees under 42 U.S.C. §§ 1983 and 1988.

We affirm as to Issues 1, 2, 4, and 6.  We reverse as to Issue 3, affirm in part and reverse in part as to Issue 5, and remand for further proceedings on these two issues.

---

[1] The named plaintiffs are Glen and Johanna Wohl, David and Tammy Edgerton, Kenneth and Elaine Chilcote, Sergio E. Pelayo, R.J.M. Real Property, LLC, Murphy Rental Properties, LLC, George Hettman and Gary Crerar, Thomas N. Marlowe, James R. and Janet A. Flanders, Guy A. and Robin R. Kautz, and Doug Frandsen.

## BACKGROUND

¶3    At the outset, it is helpful to explain how the land in question is situated. Like other western states, land in Montana is divided into tracts called townships, each of which is six miles square. Townships, in turn, are subdivided into 36 numbered tracts called sections, each of which is one mile square. *See Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 2011 MT 263, ¶¶ 6-7, 362 Mont. 273, 264 P.3d 1065. Diagram I depicts a standard township of 36 sections.

### DIAGRAM I

| 6 | 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|
| 7 | 8 | 9 | 10 | 11 | 12 |
| 18 | 17 | 16 | 15 | 14 | 13 |
| 19 | 20 | 21 | 22 | 23 | 24 |
| 30 | 29 | 28 | 27 | 26 | 25 |
| 31 | 32 | 33 | 34 | 35 | 36 |

6 miles

|1 mile|

A township's location is identified relative to an east-west base line and a north-south principal meridian. *Yellowstone River*, ¶ 6. The disputed land in this case is located in Sections 29 and 32 of Township 13 North, Range 19 West, Montana Principal Meridian.

¶4    South Avenue runs in an east-west direction on the south section line of Section 29 (which is also the north section line of Section 32). At issue is the one-half-mile segment of South Avenue between Section 29's southwest corner and south quarter corner. For clarity, a quarter corner is the point on a section line midway between the two section

corners.  *See* Joyce Palomar, *Patton and Palomar on Land Titles* vol. 1, § 116, 296-97 (3d ed., West 2003); Walter G. Robillard & Lane J. Bouman, *Clark on Surveying and Boundaries* § 9.13, 248 (7th ed., Lexis Law 1997).  This portion of South Avenue is located between the intersection with Reserve Street (on the west) and the intersection with Johnson Street (on the east).  Diagram II shows the general layout of the streets in this area (not to scale).  The relevant portion of South Avenue is shaded.[2]

**DIAGRAM II**



¶5      This area was part of Missoula County until the 1980s, when the City of Missoula began annexing various portions of it.  The City annexed the South Avenue right-of-way in 1989.  The City considers South Avenue a "principal arterial."  In the mid-1990s, the

---

[2] Diagram II and Diagram V (further below) are not included in the record, but they represent the layout of streets and blocks according to the diagrams that *are* included in the record.  The remaining diagrams below are excerpts from exhibits contained in the record.  Some labeling has been added for clarity.

City updated its urban area transportation plan to address issues of congestion citywide and to encourage other modes of transportation, such as walking, bicycling, and public transit. In conjunction with this plan, the City adopted the South Avenue Improvement Project, which contemplated the expansion of South Avenue from a two-lane rural road into a three-lane urban road with a center turn lane, bicycle lanes, curbing, and sidewalks. The question thus arose as to the width of the South Avenue right-of-way.

¶6 The portion of South Avenue between Reserve Street and the south quarter corner of Section 29 was created incrementally through four subdivision plats, each of which contains a certificate dedicating to the public the avenues, streets, and alleys depicted on the plats. These four plats were surveyed and recorded between 1904 and 1911. On the face of the plats, South Avenue appears to be 60 feet wide and centered on Section 29's south section line—i.e., a 30-foot-wide strip along the north side of the section line and a 30-foot-wide strip along the south side of the section line. The City believed, however, that the depictions on the plats might not be true to the monuments and boundary lines established in the field by the original plat surveyors. Indeed, the City believed that "irregularities" existed throughout Missoula in the widths of rights-of-way along section lines due to the manner in which subdivisions in the area had been surveyed and platted over the years. The City, therefore, hired WGM Group, Inc., an engineering, surveying, and planning firm in Missoula, to prepare a survey retracing the boundaries of the City's South Avenue right-of-way.

¶7 In contrast to an *original survey*, where the surveyor creates boundaries in the first instance and leaves behind evidence for a subsequent surveyor to find, a *retracement*

5

seeks to ascertain the boundaries established by the original survey by means of locating and recovering on the ground the remains of the evidence left by the original surveyor. The retracing surveyor's sole function is to "trace the footsteps" of the original surveyor; he may not establish new corners or boundary lines, nor may he correct errors of the original surveyor. *See Vaught v. McClymond*, 116 Mont. 542, 550, 155 P.2d 612, 616 (1945); Walter G. Robillard & Donald A. Wilson, *Brown's Boundary Control and Legal Principles* § 10.4, 268 (6th ed., John Wiley & Sons 2009) (citing *Rivers v. Lozeau*, 539 So. 2d 1147, 1151 (Fla. 5th Dist. App. 1989)); *see also* Admin. R. M. 24.183.1101(1)(c).

¶8    Thomas McCarthy, a registered land surveyor with WGM Group, conducted the retracement of South Avenue. He examined the four aforementioned subdivision plats and then attempted to locate monuments left in the ground by the original surveyors. The first plat is the R.M. Cobban Orchard Homes plat, which O.C. Finkelnberg surveyed in 1904 and the Missoula County Commissioners examined and approved in 1905. It shows the subdivision of land in the west halves of Sections 29 and 32 into lots and streets. There are approximately 90 numbered lots and 10 streets. The plat depicts South Avenue running symmetrically over the south section line of Section 29, between the southwest section corner and the south quarter corner of that section. A dimension of "60" appears over South Avenue near the section corner, and a dimension of "30" appears in the northern strip of South Avenue near the quarter corner. McCarthy concluded that this plat dedicated to the public the shaded areas shown below in Diagram III. With respect to South Avenue, the dedication included 30 feet of right-of-way along the north side of the section line, plus 30 feet of right-of-way along *part* of the south side of the section

6

line. The reason for the gaps in the south half of the dedication is that the grantors did not own those intervening tracts—i.e., the land between Lots 49 and 87, and the land east of Lot 87, as shown in Diagram III—and, thus, they could not dedicate those segments of the contemplated right-of-way. Those segments were dedicated in the subsequent plats.

**DIAGRAM III**

**(McCarthy's depiction of areas dedicated by the 1905 plat)**



¶9 The second plat is the Car Line Addition plat, which Newton Orr and James H. Bonner surveyed in 1909 and the Missoula County Commissioners examined and approved that same year. An excerpt of the plat is shown here in Diagram IV.

**DIAGRAM IV**

**(excerpt of 1909 plat)**



The certificate of dedication on the 1909 plat states that various R.M. Cobban Orchard Homes lots have been surveyed, subdivided, and platted into lots, blocks, avenues, streets, and alleys as shown on the Car Line Addition plat. In essence, the 1909 plat

7

further subdivides (and renumbers) most of the lots created by the 1905 plat, including those designated as Lots 46, 47, 48, 49, 50, and 87 on Diagram III. The 1909 plat also subdivides previously unplatted land on the south side of South Avenue, designated as Blocks 32 and 33 on Diagram IV. The northern strips of Blocks 32 and 33 are dedicated as part of the South Avenue right-of-way. South Avenue is labeled 60 feet wide at two points, which are circled on Diagram IV.

¶10 Following the 1909 Car Line Addition plat, two gaps remained in the southern half of the South Avenue right-of-way corresponding with the unplatted areas on either side of Block 41 (which are labeled on Diagram IV). These final segments were dedicated in the third and fourth plats: the Car Line Addition No. 3 plat and the Supplementary Addition to Car Line Addition plat, respectively. James H. Bonner surveyed these plats in 1910, and the Missoula County Commissioners approved them that same year. Their certificates of dedication are dated 1910 and 1911. Consistent with the 1909 Car Line Addition plat, the depictions and land descriptions on the two 1910 Car Line Addition plats indicate that South Avenue is 60 feet wide and centered on the section line.

¶11 In the field, McCarthy located monuments marking Section 29's southwest corner (at the Reserve Street intersection) and south quarter corner (near the Johnson Street intersection), both labeled on Diagram V below. These corners were first established and monumented by the General Land Office (GLO) in 1870. Between these two points, however, McCarthy did not find any other monuments in South Avenue associated with the R.M. Cobban Orchard Homes plat or the three Car Line plats. McCarthy explained at trial that the original subdivision surveyors were required to mark large stones with an

8

"X" and bury them one foot underground where street centerlines intersected.  Although he found no such stones in South Avenue, McCarthy did find them in neighboring streets, including Sussex Avenue and Livingston Avenue.  He used those monuments and certain distances stated on the Car Line plats to deduce South Avenue's boundaries.

¶12    In this regard, the Car Line plats specify the depths of the lots along the north and south sides of South Avenue.  Between South Avenue and the first parallel street to the north (Beck Avenue, later renamed Sussex Avenue), there is a strip of lots 125 feet deep, a 20-foot-wide alley, and another strip of lots 125 feet deep.  Between South Avenue and the first parallel street to the south (Dorothy Avenue, later renamed Livingston Avenue), there is a strip of lots 127 feet deep, a 20-foot-wide alley, and another strip of lots 127 feet deep.  Beck Avenue and Dorothy Avenue, like South Avenue, are labeled 60 feet wide.  Diagram V shows these dimensions (not to scale).

**DIAGRAM V**



¶13 Adding these measurements together, one would expect the distance between the centerline of Sussex Avenue and the centerline of Livingston Avenue to be 664 feet (30+125+20+125+60+127+20+127+30). As McCarthy found in the field, however, the distance is not 664 feet; it is greater. Moreover, the distance increases as one proceeds from east to west due to the fact that Sussex and Livingston are not precisely parallel to each other. At the quarter corner, the distance is approximately 683 feet, while at the intersection of South Avenue and Clark Street, the distance is approximately 695 feet.

¶14 What this means is that there is excess land between Sussex and Livingston—ranging from 19 feet to 31 feet in width—which is not accounted for by the dimensions shown on the face of the Car Line plats. Whether this land is or is not part of the South Avenue right-of-way is the crux of the dispute in this case. To be clear, there is no question that the 1905 R.M. Cobban Orchard Homes plat dedicated a 30-foot-wide strip on the north side of the section line, plus parts of a 30-foot-wide strip on the south side of the section line, and that the 1909 and 1910 Car Line plats completed the dedication of the 30-foot-wide strip on the south side of the section line. Landowners concede that their predecessors in interest dedicated a right-of-way which is 60 feet wide and centered on the section line. The issue is whether the excess land not accounted for by the measurements on the face of the Car Line plats supplemented this dedication, thus resulting in a right-of-way whose width varies and is greater than 60 feet.

¶15 McCarthy and Landowners' expert, Robert Shelton, reached opposite conclusions on this question, ultimately prompting Landowners to file the instant lawsuit against the City in April 2005. The District Court determined that the dispute could not be resolved

10

on summary judgment, and the case accordingly proceeded to a four-day bench trial in 2008 and 2009. The District Court admitted numerous exhibits and heard testimony from eleven witnesses. McCarthy and Shelton both testified at length concerning the grounds for their differing opinions.

¶16 It is a generally accepted surveying principle that a subdivision plat, being merely a graphical representation of an underlying survey, must yield to evidence of the original survey found in the field. Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.12, 370-71 (original monuments set on the ground control facts given on the plat, unless the intent is clearly otherwise). Hence, the dimensions of platted streets are controlled by the lines run and monumented in the field by the original surveyors, to the extent those lines are ascertainable. Robillard & Bouman, *Clark on Surveying and Boundaries* § 21.10, 705 (where there is a dispute as to the boundary line between a street and the abutting lots, the lines actually run on the ground control over the plat). Here, as noted, no original monuments were found in South Avenue other than the two GLO monuments marking the section corner and the quarter corner. Accordingly, McCarthy and Shelton endeavored to deduce the street's dimensions from other available evidence.

¶17 McCarthy began with the premise that the excess land between Sussex and Livingston is too large to have been the result of systematic error (such as the use of a faulty measuring tool) or random error (such as the failure to adjust for a slope), and thus was either a blunder (such as the misrecording of a dimension) or a deliberate act. He surmised that Bonner, the primary surveyor of the Car Line plats, laid out rectangular and gridded systems of streets and blocks on each side of South Avenue—tying the

dimensions on the north side of South Avenue to Section 29's south quarter corner, and the dimensions on the south side of South Avenue to Section 29's southwest section corner—and left the excess land as part of South Avenue. McCarthy opined that Bonner intended the lots along each side of South Avenue to have uniform depths, even if this meant that South Avenue itself would end up with a varying width. He based this conclusion, in part, on the fact that Bonner used variable lot widths when closing on boundaries in an east-west direction but used uniform lot depths when closing on boundaries in a north-south direction. This can be seen in the lots along the north side of South Avenue in Block 29 of the 1909 plat, shown below in Diagram VI. Each lot is 25 feet wide except the westernmost lot closing on Eaton Street, which is 45.4 feet wide. Conversely, all of the lots are a uniform 125 feet deep; there are no varying depths. The other blocks along South Avenue have these same characteristics.

**DIAGRAM VI**



¶18    McCarthy also based his conclusion (as to Bonner's intent) on a perceived lack of detail on the Car Line plats concerning South Avenue's width and position. For example, Bonner did not show Section 29's southwest section corner, south quarter corner, and south section line on the 1909 plat. Moreover, although Bonner showed the quarter

corner on the first 1910 plat, and although the section line appears to be the centerline of South Avenue on that plat, McCarthy theorized that if Bonner truly intended the section line to serve this purpose, he would have set stones in South Avenue and specified variable depths for the abutting lots. McCarthy observed that there are no variable depths on the plats and that he had found no stones in South Avenue. Finally, although there is a 60-foot label in South Avenue near the southeast corner of Block 29 of the 1909 plat (as shown above in Diagram VI), McCarthy pointed out that this dimension is technically not possible at this particular location because the grantors did not own the land immediately to the south of the section line at that time. He thus decided to give the label no weight.

¶19 In sum, McCarthy's opinion was that Bonner created lots and blocks of uniform depth on each side of South Avenue, that Bonner deliberately or accidentally left South Avenue "undeterminable as to its width," and that South Avenue, therefore, "received any excess or deficiency." Under this approach, the dedicated right-of-way is 60 feet wide from Reserve Street to Clark Street, where it jumps to 91 feet wide. From Clark Street to Section 29's south quarter corner, the right-of-way tapers from 91 feet down to 79 feet in width. These boundaries are shown with bold lines in Diagram VII.

**DIAGRAM VII**



13

¶20    McCarthy depicted his conclusions regarding South Avenue's dimensions on Certificate of Survey No. 5007 (COS 5007), which was filed with the Missoula County Recorder in November 1999.  Thereafter, the City gave notice of its intent to proceed with improvements to the street within the dimensions shown on COS 5007.  Applying those dimensions to existing conditions in the field, it was discovered that numerous features on Landowners' properties—including porches, stoops, hedges, trees, fences, sidewalks, driveways, and building overhangs—were within the claimed right-of-way.  This is illustrated on Diagram VIII, which is an excerpt of a 2002 aerial photograph.  The bold line represents the right-of-way's northern boundary under McCarthy's analysis.

**DIAGRAM VIII**



¶21    Skeptical about the City's claim of a right-of-way wider than 60 feet, Landowners retained Shelton, a registered land surveyor, to examine COS 5007 and give his opinion regarding McCarthy's conclusions.  Shelton disagreed with McCarthy for essentially four reasons.  First, contrary to McCarthy's view that the width of South Avenue is undefined on the Car Line plats, Shelton pointed out that the certificates of dedication on the two 1910 plats describe the northeast corner of Block 40 (shown in Diagram IX below) as

14

being 30 feet south of the section line. Furthermore, at this same location, the first 1910 plat shows a 30-foot dimension (circled on Diagram IX) within South Avenue on the north side of the section line. These facts together, Shelton observed, clearly show that South Avenue was contemplated to be 60 feet wide and centered on the section line. Indeed, the language in the certificates of dedication indicates that the grantors believed they were dedicating a 60-foot-wide right-of-way and were unaware of any excess land. Notably, McCarthy acknowledged under cross-examination that "if Bonner knew he had a blunder out there . . . and thought his client might make him re-hand-draft all of this thing here - okay - he might have not disclosed his blunder."

**DIAGRAM IX**



¶22 Second, Shelton disagreed with the significance McCarthy had attributed to the fact that no original stones were found in South Avenue. Shelton testified that he had personally seen the water main in South Avenue being replaced some years earlier, and he doubted that any monuments which Bonner might have set in South Avenue would have remained after that process. Notably, McCarthy conceded this point as well under cross-examination, acknowledging that Bonner could have set stones that later were obliterated or removed when the water main and utilities were installed.

15

¶23  Third, Shelton believed McCarthy's approach was inconsistent with the principle that, "[i]n the absence of monuments, streets are given the width called for on the plat, regardless of excess or deficiency that may exist within a subdivision." Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.23, 381. *Brown's* gives an illustration of this principle that is virtually identical to the present case. Original monuments were found two blocks apart, and the measured distance between them was 652 feet. The record distance, however, was 650 feet: a block 300 feet wide, plus a street 50 feet wide, plus another block 300 feet wide. No monuments were found within or along the street. In these circumstances, "[t]he proper procedure is to give blocks 1 and 2 exactly half of the surplus (1 foot each) and give the street exactly 50 feet, as called for by the map." Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.23, 381-82. McCarthy did just the opposite: He gave the blocks the exact depths called for by the plats and gave the surplus to the street.

¶24  Finally, Shelton believed McCarthy's approach was inconsistent with § 1339, RCM (1907), which states that "[t]he width of all public highways, except bridges, alleys and lanes, must be sixty feet unless a greater or less width is ordered by the Board of County Commissioners on petition of the persons interested." For all of these reasons, Shelton concluded that the excess land should not be placed in South Avenue.

¶25  In its findings of fact and conclusions of law, the District Court accepted McCarthy's testimony as to the retracement of the Car Line plats and the existence of excess land between Sussex and Livingston. The court disagreed, however, with McCarthy's opinion that the excess belongs in South Avenue. The court found that the

original subdivision plats, together with their associated certificates of dedication, clearly show that the grantors intended South Avenue to be 60 feet wide. The court observed there was no dispute that the 1905 R.M. Cobban Orchard Homes plat dedicated a portion of a 60-foot-wide right-of-way centered on the section line, and there was no evidence that the grantors of the 1909 and 1910 Car Line plats intended South Avenue's location and width to be any different. The court further found that the City had shown no convincing evidence that the Missoula County Commissioners accepted a right-of-way wider than 60 feet, and that the City also had established no legal basis for disregarding Montana law, which generally requires the width of public roads to be 60 feet. Section 1339, RCM (1907). The District Court thus ruled that South Avenue is a symmetrical, 60-foot-wide public right-of-way centered on the section line. Correspondingly, the excess land lying outside this 60-foot parameter (shown with crosshatching on each side of South Avenue in Diagram X) is not part of the right-of-way.

**DIAGRAM X**



¶26 By the time this case was tried in the District Court, the City had completed its improvements to South Avenue. (The construction took place in 2005.) The District Court found that these improvements exceeded the right-of-way's 60-foot limits.

17

Accordingly, the second issue before the court concerned just compensation for the City's taking of property for public use. Applying a value of $22.52 per square foot, the court awarded compensation where any of the City's improvements encroached upon Landowners' properties. This ultimately totaled close to $230,000. The District Court also awarded Landowners costs and attorney's fees totaling $145,394.

## STANDARDS OF REVIEW

¶27 We review the factual findings of a trial court sitting without a jury to determine whether the findings are clearly erroneous. *Larsen v. Richardson*, 2011 MT 195, ¶ 25, 361 Mont. 344, 260 P.3d 103. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Larsen*, ¶ 25.

¶28 We review an award of damages to determine whether the trial court abused its discretion. *Hansen v. Granite County*, 2010 MT 107, ¶ 43, 356 Mont. 269, 232 P.3d 409. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990); *see also Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 17, 351 Mont. 464, 215 P.3d 649 (our review is plenary to the extent that a discretionary ruling is based on a conclusion of law).

¶29 A trial court's decision as to whether legal authority exists to award attorney's fees is a conclusion of law. *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 42, 354 Mont. 50, 221 P.3d 1230. We review conclusions of law de novo, to determine whether

the court's interpretation of the law is correct. *Larsen*, ¶ 25. If legal authority exists to award attorney's fees, we review for abuse of discretion the court's decision to grant or deny the fees. *Hughes v. Ahlgren*, 2011 MT 189, ¶ 10, 361 Mont. 319, 258 P.3d 439.

**DISCUSSION**

¶30 ***Issue 1. Did the District Court err in determining that the City's right-of-way constituting South Avenue is limited to 60 feet in width?***

¶31 The City contends that the District Court erred in limiting the width of South Avenue to 60 feet. The City makes four arguments in this regard.

**A. Survey Monuments**

¶32 The City first argues that the District Court failed to consider survey monuments on the ground. It is well established that,

> [i]n ascertaining the lines of land or in re-establishing the lines of a survey, the footsteps of the original surveyor, so far as discoverable on the ground, should be followed and it is immaterial if the lines actually run by the original surveyor are incorrect. In surveying a tract of land according to a former plat or survey, the surveyor's only duty is to relocate, upon the best evidence obtainable, the courses and lines at the same place where originally located by the first surveyor on the ground.

*Vaught*, 116 Mont. at 550, 155 P.2d at 616 (citations, emphasis, and internal quotation marks omitted); *accord Larsen*, ¶ 32; Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 10.4, 268. As a corollary, it is also well settled that "what the original surveyor actually did by way of monumenting his survey on the ground takes precedence over what he intended to do as shown by his written plat of survey." *Tyson v. Edwards*, 433 So. 2d 549, 552-53 (Fla. 5th Dist. App. 1983) (explaining the rationale for this rule); *accord Price v. Mauch*, 616 S.W.2d 738, 740 (Ark. App. 1981); *Arnold v.*

19

*Hanson*, 204 P.2d 97, 98-99 (Cal. App. 3d Dist. 1949); *Phillippe v. Horns*, 196 N.W.2d 382, 384 (Neb. 1972); *DD&L v. Burgess*, 753 P.2d 561, 564 (Wash. App. Div. 1 1988); Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.12, 370-71.

¶33 Citing these principles, the City maintains that the District Court erroneously relied on "inaccurate" subdivision plats and certificates of dedication, rather than on the monuments set by Bonner, to determine South Avenue's width. We disagree. The rule that a plat yields to original monuments on the ground presupposes that such monuments were set and have been located by the retracing surveyor. Here, had McCarthy found original monuments set by Bonner in South Avenue (or monuments set by others and known to perpetuate the positions of the original monuments set by Bonner), those monuments would have taken precedence over the plats in determining South Avenue's position and dimensions. *Tyson*, 433 So. 2d at 552-53; *Larsen*, ¶¶ 44, 54 (discussing the priority of calls); § 70-20-201(2), MCA; Robillard & Bouman, *Clark on Surveying and Boundaries* § 21.10, 705. McCarthy did not find original monuments (or perpetuations of original monuments) set by Bonner in South Avenue, however. He found them in neighboring streets instead—Sussex and Livingston in particular. He then relied on those monuments and the measurements of lots and alleys stated on the face of the Car Line plats to deduce South Avenue's dimensions. The District Court advised the City at the end of trial that it did *not* "question the surveying that was done by Mr. McCarthy." The court accepted the Bonner monuments McCarthy had found in Sussex and Livingston and upon which he had relied in making his retracement. The court simply disagreed with McCarthy's opinion as to where the excess land belonged.

20

¶34 As explained, the measurements on the Car Line plats indicate that the distance between the centerlines of Sussex and Livingston is 664 feet. Yet, the actual distance—based on the original monuments McCarthy found in Sussex and Livingston—ranges from 683 feet to 695 feet. The issue is whether the excess land (ranging from 19 feet to 31 feet in width) belongs in South Avenue. Again, no original Bonner monuments that might answer this question have been found in South Avenue. In lieu of such evidence, the District Court relied on information provided on the Car Line plats. Contrary to the City's supposition, this was not error. Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.12, 371 ("When facts cannot be established on the ground—that is, the lines were never run on the ground or are lost completely—the data on the map are the best available evidence.").

## B. Section 76-3-614, MCA

¶35 The City's second argument is that the District Court "failed to address the legal ramifications of the retracement survey." The City cites § 76-3-614, MCA, which states:

> When a recorded plat does not definitely show the location or size of lots or blocks or the location or width of any street or alley, the governing body may at its own expense cause a new and correct survey and plat to be made and recorded in the office of the county clerk and recorder. The corrected plat must, to the extent possible, follow the plan of the original survey and plat. The surveyor making the resurvey shall endorse the corrected plat referring to the original plat and noting the defect existing therein and the corrections made.

The City expresses concern that if the District Court's judgment in this case is affirmed, "it will kill the statutory retracement process for cities and governmental bodies charged with improvements along public highways." We are not persuaded.

21

¶36    Nothing in the District Court's decision or in our decision today impugns the use of retracement surveys as a means to locate property boundaries.  Section 76-3-614, MCA, authorizes a governing body to cause a new and correct survey and plat to be made and recorded.  The statute does not say, however, that the resulting survey is immune from challenge by a landowner whose property rights are affected by the survey.  Any retracement survey must be made in accordance with applicable legal rules and surveying standards.  *See e.g.* § 76-3-614, MCA ("The corrected plat must, to the extent possible, follow the plan of the original survey and plat."); Admin. R. M. 24.183.1104 (setting forth uniform standards for certificates of survey).  The surveying treatise cited by the City in its briefs, and upon which McCarthy and Shelton both relied, recognizes that "[a] retracement of an original boundary is predicated on the evidence recovered and is always subject to collateral attack by others, even though the attackers have never conducted their own retracement."  Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 14.17, 442.  Here, Landowners presented evidence which called into question the correctness of McCarthy's retracement.  After finding that genuine issues of material fact existed, the District Court permitted the parties to present their respective cases at trial.  The court then resolved the dispute based on the facts and law presented.  That the court ultimately rejected McCarthy's opinion about where the excess land in this particular circumstance should be placed does not "kill" the use of retracement surveys.

### C.  Placement of the Excess

¶37    The City next argues that the District Court did not properly consider and apply surveying principles related to blunders and the placement of an excess or deficiency.

The general rule is that an error should be placed where the error occurs, if it can be ascertained. Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 11.27, 340, § 12.26, 385. Thus, where the measured distance between found original monuments differs from the recorded distance between those monuments, the excess or deficiency should be placed where the mistake occurred. Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.27, 385-86, § 12.39, 400. For example, assume that Block 1 and Block 2 are separated by B Street, and the record widths of Blocks 1 and 2 are 300 feet each. Original stakes have been found at the four corners of Block 1 and at the four corners of Block 2. Measurements reveal that Block 1 is actually 299 feet and Block 2 is actually 301 feet. There is thus a one-foot shortage in Block 1 and a one-foot surplus in Block 2. In these circumstances, B Street cannot be moved one foot over to give Blocks 1 and 2 each exactly the record 300-foot measurement. Rather, the errors are placed where they occurred: the one-foot shortage remains in Block 1 and is prorated among the lots in that block, and the one-foot surplus remains in Block 2 and is prorated among the lots in that block. Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.29, 386-87.

¶38 Citing these principles, the City contends that the District Court was required to place the excess land in South Avenue, rather than in the lots that abut South Avenue. The difficulty with the City's argument is that, unlike the above example where the original stakes found in the corners of Blocks 1 and 2 revealed the location of the original surveyor's error, in the present case no original Bonner monuments have been found in South Avenue establishing whether Bonner's mistake was in the dimensions he ascribed

to South Avenue or in the dimensions he ascribed to the abutting lots. To ascertain the location of Bonner's mistake, therefore, it is necessary to evaluate the other available evidence. McCarthy and Shelton did just that, but arrived at different conclusions as to which dimensions shown on the plats are in error.

¶39   In this regard, the location of a boundary line on the ground is a question of fact. *Robertson v. Lees*, 189 S.W.3d 463, 469 (Ark. App. 2004); *Snyder v. Haagen*, 679 A.2d 510, 513 (Me. 1996); *Gulas v. Tirone*, 919 N.E.2d 833, 837-38 (Ohio App. 7th Dist. 2009). "[W]hen two competent surveyors disagree as to where a boundary line should be, the trial court's determination as to which surveyor is correct depends mainly on each surveyor's credibility and will not be reversed if there is reasonable support in the evidence for such a determination." *Wojahn v. Johnson*, 297 N.W.2d 298, 303 (Minn. 1980); *see also e.g. Funk v. Robbin*, 212 Mont. 437, 442-43, 689 P.2d 1215, 1218-19 (1984) (applying this rule in reviewing a jury verdict). Here, the application of relevant surveying principles to the evidence presented at trial provides reasonable support for the District Court's decision to accept Shelton's placement of the excess.

¶40   One of the surveying principles cited by Shelton is directly on point. It states: "In the absence of monuments, streets are given the width called for on the plat, regardless of excess or deficiency that may exist within a subdivision. . . . [D]eficiency or excess cannot exist within a street except where the original monuments set by the original surveyor indicate otherwise." Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.23, 381-82. *Brown's* explains that the "weight of reason" is against placing an excess or deficiency within a public way because

[b]efore the establishment of any subdivision, street widths that are acceptable to the public are determined by the governing agency, and the subdivision is accepted by the public agency on the condition that the streets are of a certain definite width. The size of lots is determined by the whims of the subdivider, the desires of the purchasers, and the minimum area requirements of the planning agency. The tendency of all subdividers is to make the streets of minimum width so as to have a maximum amount of land for lots. The streets are definite and fixed, whereas the lots are variable.

Robillard & Wilson, *Brown's Boundary Control and Legal Principles* § 12.23, 382-83.

¶41   Consistent with this principle, the Car Line plats, together with their certificates of dedication, show that the grantors contemplated South Avenue to be 60 feet wide and centered on the section line. South Avenue is plainly labeled 60 feet wide in two places on the 1909 plat, and the 1910 plats together describe and depict South Avenue as 60 feet wide and centered on the section line. There is no evidence that the grantors knew about the non-depicted excess land; but even assuming, for the sake of argument, that they were aware of the excess and that they intended to dedicate it as part of South Avenue, there is no convincing evidence that the Missoula County Commissioners intended to accept a right-of-way wider than 60 feet. *See* Eugene McQuillin, *The Law of Municipal Corporations* vol. 11A, § 33:61, 680-81 (3d ed., Thomson Reuters 2009) ("acceptance of a part [of the property dedicated] is not necessarily an acceptance of all").

¶42   In discussing this point, the District Court cited the statutory requirement that "[t]he width of all public highways, except bridges, alleys and lanes, must be sixty feet unless a greater or less width is ordered by the Board of County Commissioners on petition of the persons interested." Section 1339, RCM (1907), *now codified at* § 7-14-2112(1), MCA (2011). The City asserts, and we agree, that this statute does not

25

control the width of South Avenue. This Court has recognized that this statute was intended to apply only to public roads that were formally laid out by the official act of the proper public authorities and is not applicable to highways, roads, or lanes created by dedication or prescription. *See State v. Portmann*, 149 Mont. 91, 95-96, 423 P.2d 56, 58 (1967) (citing *Mulch v. Nagle*, 197 P. 421, 425 (Cal. App. 1st Dist. 1921) (interpreting a similar California statute)); *see also Donovan v. Union Pac. R.R. Co.*, 177 N.W. 159, 160 (Neb. 1920). Nevertheless, § 1339, RCM (1907), does support the District Court's inference that, absent any credible evidence to the contrary, the Missoula County Commissioners intended to accept a right-of-way having a uniform 60-foot width.

¶43 In sum, the depictions on the Car Line plats, the descriptions in the certificates of dedication, the surveying principles discussed above, and the statutory preference for public roadways of uniform 60-foot width all support the District Court's determination that South Avenue is 60 feet wide and centered on the section line.

### D. Workability

¶44 The City's final contention is that the District Court's decision is unworkable. Two of the City's arguments in this regard reiterate matters we already have addressed, namely, the ability of governing bodies to obtain retracement surveys under § 76-3-614, MCA, and the relevance of § 1339, RCM (1907). In addition to these two points, the City claims that the parameters of its right-of-way are "unknowable" because there is no surveyed centerline in South Avenue. We note, however, that McCarthy found GLO monuments marking the locations of Section 29's southwest corner and south quarter corner. The District Court ruled that South Avenue is a symmetrical 60-foot-wide public

26

right-of-way "divided by the section corner located at the intersection of South Avenue and Reserve Street and the quarter corner located between Kemp and Johnson Street[s]." The City presents no credible reason why the parameters of this portion of South Avenue, the only right-of-way at issue in this case, are "unknowable."

¶45   For the foregoing reasons, we hold that the District Court did not err in determining that the South Avenue right-of-way is limited to 60 feet in width.

¶46   ***Issue 2.   Are Landowners entitled to compensation for a taking of property?***

¶47   The City contends that the District Court, in ruling that the excess land is not part of South Avenue, effectively "enlarg[ed]" Landowners' lots.   The City argues that Landowners are not entitled to compensation for a taking of "land that was never deeded to the Plaintiffs and for which the Plaintiffs have never paid taxes."   We conclude that this argument fails for three reasons.

¶48   First, as stated in the District Court's findings of fact, the parties stipulated that the fee ownership of lots abutting South Avenue runs from the alley centerline to the South Avenue centerline—meaning that the excess land is part of Landowners' lots regardless, the only question being whether the excess land is, or is not, encumbered by the City's right-of-way.[3]   Second, the City concedes that Landowners' lots "have been described in all past deeds by reference to the Car Line plats."   The District Court found that the Car Line plats dedicated South Avenue with a 60-foot width centered on the section line.   In

---

[3] This stipulation was based on Montana law, which states that the owner of land bounded by a road, street, or highway is presumed to own to the center thereof, although the contrary may be shown.  *See* § 4530, RCM (1907), *now codified at* § 70-16-202, MCA (2011); § 4626, RCM (1907), *now codified at* § 70-20-307, MCA (2011); *Herreid v. Hauck*, 254 Mont. 496, 499, 839 P.2d 571, 573 (1992).

27

so doing, the court did not "enlarge" Landowners' lots; the court simply determined that the excess land—which the parties had stipulated is part of Landowners' fee ownership—is not (and has never been) encumbered by the right-of-way. We have affirmed this determination under Issue 1. Third, the District Court did not enter any findings of fact concerning Landowners' payment or nonpayment of taxes. Moreover, the City has not presented a cogent argument, with citations to legal authority, for the proposition that a landowner is not entitled to receive compensation for a taking of property that the landowner owns but on which the landowner allegedly has not been paying taxes. A party is responsible for developing legal analysis that supports its position on appeal. *In re Marriage of Damschen*, 2011 MT 297, ¶ 41, 363 Mont. 19, 265 P.3d 1245.

¶49 For these reasons, we reject the City's argument that Landowners are not entitled to compensation for a taking of property.

¶50 ***Issue 3. Did the District Court apply an incorrect measure of compensation?***

¶51 Landowners called Kraig Kosena, an MAI certified appraiser, to testify regarding the value of bare land in the vicinity of Landowners' properties. Kosena testified that the land fronting South Avenue between Reserve Street and Johnson Street is zoned for commercial use. He discussed the sale of a vacant parcel that he considered to be comparable (for land-valuation purposes) to other properties in the area. This parcel, located on South Avenue between Kemp Street and Johnson Street, and measuring 16,875 square feet, sold for $380,000 on April 7, 2006—which equates to $22.52 per square foot. Kosena testified that this figure is "an excellent indicator of what the market was recognizing to be the value of property in that corridor *at that time*" (emphasis

28

added). He acknowledged, however, that this sale occurred approximately seven months after the South Avenue Improvement Project had been completed. He also conceded that property values were generally increasing in 2006 and, thus, "if you were going earlier in time, I think you would back off of that [$22.52 per square foot] sale price in an adjustment for time." Finally, Kosena agreed that the completion of improvements to South Avenue "could" have been a factor causing the values of properties along the street to increase from 2005 to 2006.

¶52 The City called Tom Stuckey, who also is an MAI certified appraiser. Stuckey testified that the same 16,875-square-foot parcel that sold for $22.52 per square foot in April 2006 had sold for $15.41 per square foot a year earlier, in March 2005, just before the City began construction of the South Avenue improvements. Stuckey further testified that another parcel in the vicinity sold in March 2005 with a value of $15.00 per square foot for the bare land. When asked whether the March 2005 sales figures better reflected the value of land at the commencement of construction than the April 2006 figure, Stuckey answered in the affirmative, explaining that sales information which does not exist as of the effective date of a valuation "would be misleading because it would not reflect information available to the marketplace during that time period. . . . The best sales are the sales that have occurred as close to the date of valuation as possible."

¶53 The District Court nevertheless accepted Kosena's $22.52 figure for purposes of assessing compensation. The City contends this was error because the proper measure of compensation is the value of the property "at the time of the taking." The City cites § 70-30-302(1), MCA, which provides that "the right to compensation is considered to

have accrued at the date of the service of the summons, and the property's current fair market value as of that date is the measure of compensation . . . ." The City maintains that the proper measure here is $15.00 per square foot.

¶54 We agree with the City that the District Court erred, but we do not agree that § 70-30-302(1), MCA, is controlling. That provision is one of several statutes setting out the procedures in formal condemnation proceedings. *See generally* Title 70, chapter 30, parts 2 and 3, MCA. The City did not initiate formal condemnation proceedings in this case, however. Rather, based on its "good faith" belief that its right-of-way included the land in question,[4] the City proceeded with the South Avenue improvements without first obtaining a condemnation order. *See* §§ 70-30-206, -309, MCA.

¶55 Where the government does not acquire privately owned land statutorily, but instead physically enters into possession or institutes regulations that restrict the land's use, the owner has a right to bring an "inverse condemnation" action to recover the value of the land. *U.S. v. 191.07 Acres of Land*, 482 F.3d 1132, 1136 (9th Cir. 2007). "Such a suit is 'inverse' because it is brought by the affected owner, not by the condemnor. The owner's right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation." *Kirby Forest Indus. v. U.S.*, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (citation and internal quotation marks omitted); *see also* U.S. Const. amend. V ("private property [shall not] be taken for public use, without just compensation"); Mont. Const. art. II, § 29 ("Private property shall not

---

[4] The District Court found "that the City of Missoula acted in good faith based on the information provided to them by Mr. Tom McCarthy" when it seized the strips of land at issue.

be taken or damaged for public use without just compensation . . . .").  While the instant lawsuit was not originally filed as an inverse condemnation action—Landowners initially sought to enjoin the City's road-improvement operations along South Avenue—the question of injunctive relief soon became moot, and the District Court thus granted relief based on inverse condemnation principles.

¶56    "Although the concept of 'just compensation' is the same in traditional and inverse condemnation proceedings, the actions are sufficiently different so that procedures applicable to one type of action do not necessarily apply to the other."  *KLK, Inc. v. U.S. Dept. of the Interior*, 35 F.3d 454, 457 (9th Cir. 1994).  One difference, relevant here, is that in a traditional condemnation, the land is valued at the time the condemnation proceeding occurs (specifically, in Montana, at the date of the service of the summons, § 70-30-302(1), MCA), while in an inverse condemnation action, just compensation is based on the value of the land *at the time it is seized.  KLK, Inc.*, 35 F.3d at 457 (citing *U.S. v. Clarke*, 445 U.S. 253, 258, 100 S. Ct. 1127, 1130 (1980)).  Here, the City commenced physical occupation of, and thus seized, the land at issue in April 2005.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S. Ct. 3164, 3171 (1982) ("a permanent physical occupation authorized by government is a taking").  Kosena conceded, however, that his $22.52-per-square-foot figure reflected the value of bare land in the South Avenue corridor in April 2006, *not* April 2005.  He stated that "[i]f I were appraising something in there with an April 2005 date . . . , I think I could, with a reasonable degree of certainty, with market data, extrapolate a time adjustment."  Kosena did not provide a time-adjusted figure representing land values in April 2005.

¶57 Landowners emphasize that we review an award of damages to determine whether the trial court abused its discretion. *Hansen v. Granite County*, 2010 MT 107, ¶ 43, 356 Mont. 269, 232 P.3d 409. "The abuse-of-discretion standard," however, "includes review to determine that the discretion was not guided by erroneous legal conclusions." *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2048 (1996); *see also Cooter & Gell*, 496 U.S. at 405, 110 S. Ct. at 2461 (a court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law). In applying a measure of compensation that did not reflect the value of Landowners' land at the time the City seized it, the District Court based its ruling on an erroneous view of the law and thereby abused its discretion. We accordingly reverse the portion of the District Court's judgment which specifies Landowners' compensation for a taking of property and remand for further proceedings on this question, as detailed below in the Conclusion section.

¶58 *Issue 4. May Landowners recover their costs and attorney's fees?*

¶59 The City contends that the District Court lacked authority to award Landowners their costs and attorney's fees. The City notes that Montana follows the American Rule, under which a party in a civil action may not recover attorney's fees absent a specific contractual or statutory provision. *Hughes v. Ahlgren*, 2011 MT 189, ¶ 13, 361 Mont. 319, 258 P.3d 439. The City admits that costs and attorney's fees are recoverable in a condemnation action under § 70-30-305, MCA, but the City argues that Landowners have not met the requirements of this statute. In response, Landowners argue that they have satisfied § 70-30-305, MCA. In addition, they cite § 27-8-313, MCA, as authority for an award of fees in this case. We conclude that we need not address these statutory

arguments, however, because Article II, Section 29 of the Montana Constitution, upon which the District Court relied, provides the necessary authority.

¶60    Article II, Section 29 states in full:

> **Eminent domain.**  Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. *In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.*

Mont. Const. art. II, § 29 (emphasis added).  The District Court observed in its findings of fact and conclusions of law that the City could have pursued condemnation proceedings to obtain the land needed for the planned improvements to South Avenue. Instead, although not acting in bad faith, the City nevertheless proceeded to take portions of Landowners' properties for public use without compensation.  In so doing, the City forced Landowners to commence this litigation to protect their property rights.  They ultimately prevailed on their claim that the land seized by the City was not part of the City's right-of-way.  We agree with the District Court that, in these circumstances, Landowners are constitutionally entitled to the "necessary expenses of litigation," Mont. Const. art. II, § 29, which include court costs and reasonable attorney's fees.  *See Mont. Dept. of Hwys. v. Standley Bros.*, 215 Mont. 475, 482, 699 P.2d 60, 64 (1985); *Rauser v. Toston Irrigation Dist.*, 172 Mont. 530, 543-45, 565 P.2d 632, 640-41 (1977).

¶61    The City further argues that it is not liable for costs and attorney's fees unless its defense to this lawsuit was "frivolous" or "pursued in bad faith."  *See* § 25-10-711(1), MCA (providing, in relevant part, that in a civil action brought against a political subdivision of the State, the plaintiff is entitled to costs and attorney's fees if the plaintiff

prevails and if the court finds that the political subdivision's defense was "frivolous or pursued in bad faith"). The City notes that the District Court made no finding of frivolousness or bad faith on the part of the City. We conclude, however, that because the award of costs and fees in the present case is premised on an express provision of the Montana Constitution, § 25-10-711(1), MCA, is inapplicable. The general limitation on costs and fees in the statute does not apply in the face of the explicit constitutional directive for costs and fees in a case brought under Article II, Section 29.

¶62 The District Court awarded Landowners $115,352 in attorney's fees, $25,132 in expert-witness fees, and $4,910 in allowable costs (all of which were incurred in the main litigation, as opposed to the "fees for fees" litigation discussed below in Issue 5). The District Court expressly found that awarding fees and costs totaling $145,394 "is a fair and reasonable award in this case." Aside from arguing that the District Court lacked authority to make this award, the City presents no argument that the District Court abused its discretion as to the amount awarded. We accordingly affirm that award.

¶63 *Issue 5. Did the District Court abuse its discretion in denying Landowners "fees for fees" and in directing counsel not to pass certain fees on to his clients?*

¶64 In response to Landowners' Bill of Fees and Costs, the City filed objections on the ground that not all of the claimed fees and costs were reasonable and necessary. The District Court held a hearing, at which time Landowners presented expert testimony from attorney Jon Beal. Thereafter, Landowners supplemented their Bill of Fees and Costs to include the expenses incurred in proving their underlying fees and costs. The City objected to this "fees for fees" request.

34

¶65    The District Court found the City's fees-for-fees objections "well-taken."  Citing

*Mont. Dept. of Hwys. v. McGuckin*, 242 Mont. 81, 788 P.2d 926 (1990), *Mont. Dept. of*

*Transp. v. Slack*, 2001 MT 137, 305 Mont. 488, 29 P.3d 503, and *K&R Partn. v. City of*

*Whitefish*, 2008 MT 228, 344 Mont. 336, 189 P.3d 593, the District Court stated:

> The Court does not believe this case falls within the rare exception in which extraordinary circumstances justify an award of attorney fees expended by Plaintiffs' counsel in proving the amount and reasonableness of his attorney fees.  [Citations to *McGuckin*, *Slack*, and *K&R Partnership*.]  It is also this Court's opinion that recovery of attorney Jon Beal's fees billed in the amount of $4,000.00 on the issue of the reasonableness of attorney fees claimed by Plaintiff's counsel is not chargeable to the City as well.
>     Furthermore, under the above cited cases, Plaintiffs' counsel shall not pass this cost onto his clients, as attorney fees for proving the amount and reasonableness of attorney fees should be borne by the attorney and not his client or the other party.

In their cross-appeal, Landowners contend that the District Court abused its discretion in

rendering these rulings.

¶66    This Court has observed that the award of costs and attorney's fees incurred in

proving underlying litigation expenses in a condemnation action is "fraught with

problems."  *McGuckin*, 242 Mont. at 85, 788 P.2d at 929.  On one hand, the condemnor

could object to every expense item claimed, even if all expenses claimed are reasonable,

thereby forcing the landowner to incur additional expenses in securing his award and

potentially denying the landowner a net recovery.  This would be contrary to the policy

underlying Article II, Section 29 "to make the landowner whole after the State takes his

property."  *McGuckin*, 242 Mont. at 84, 85, 788 P.2d at 928, 929.  On the other hand, the

landowner and his counsel could make unreasonable and inflated expense claims that

force the condemnor to object and lead to further litigation upon which a landowner's

35

counsel can claim additional fees. This would place an unwarranted cost burden on the condemnor. *McGuckin*, 242 Mont. at 85-86, 788 P.2d at 929.

¶67 Given these concerns, the Court adopted two rules applicable to fees-for-fees situations in condemnation actions. First, the costs and attorney's fees associated with proving the *attorney's fees* incurred in the underlying litigation generally must be borne the landowner's counsel. Neither the condemnor nor the landowner/client is required to pay this expense. *McGuckin*, 242 Mont. at 86-87, 788 P.2d at 929-30; *Slack*, ¶ 31. There is one "rare" exception to this rule: In order to achieve an equitable result in "extraordinary circumstances," the district court in its sound discretion may require the condemnor to pay the expenses associated with proving the underlying attorney's fees. *McGuckin*, 242 Mont. at 87, 788 P.2d at 930; *see also Slack*, ¶ 33 ("extraordinary circumstances" refers to "those circumstances in which the State's objection to the condemnee's fee claim is unreasonable"). Second, the costs and attorney's fees associated with proving underlying litigation expenses *other than attorney's fees* are chargeable to the client and to the condemnor. *McGuckin*, 242 Mont. at 87, 788 P.2d at 930; *K&R Partn.*, ¶ 74. The decision to award such costs and fees is, again, within the sound discretion of the district court. *McGuckin*, 242 Mont. at 87, 788 P.2d at 930; *K&R Partn.*, ¶¶ 73-75.

¶68 Landowners have not presented any persuasive argument for departing from these rules or for applying a different rule in *inverse* condemnation cases. Thus, with one exception discussed below, we conclude that Landowners have not demonstrated that the District Court's fees-for-fees rulings should be reversed. The City's objections to

Landowners' underlying attorney's fees were not unreasonable; indeed, the District Court sustained some of the City's objections. The District Court acted within its considerable discretion, therefore, when it concluded that this case is not one of the "extraordinary circumstances" we were referring to in *McGuckin*, and it properly denied an award of costs and fees incurred in proving the amount of the underlying *attorney's fees*. *See Slack*, ¶ 33. Furthermore, with respect to Landowners' underlying litigation expenses *other than attorney's fees*, the District Court found the City's objections to Landowners' costs and fees incurred in proving these expenses to be "well-taken." This was a discretionary call by the District Court, and Landowners have not persuaded us that the court abused its discretion.

¶69    Hence, in the present case, Landowners and their counsel must bear the costs and fees incurred in proving the costs and fees of the underlying litigation. Under *McGuckin*, 242 Mont. at 87, 788 P.2d at 930, Landowners' counsel may not charge his clients with the expense of proving the underlying *attorney's fees*, but he may pass on to his clients the expense of proving the underlying litigation expenses *other than attorney's fees*. Landowners assert that the District Court did not draw this distinction in its order. They point out that their expert, Beal, testified not only as to the reasonableness of their underlying attorney's fees, but also as to the reasonableness of their *other* underlying litigation expenses. Yet, the District Court barred counsel from passing on to his clients *any* of Beal's $4,000 fee. We agree with Landowners that *McGuckin* does not prohibit Landowners' counsel from charging his clients for the portion of Beal's fee that relates to Beal's analysis and testimony regarding the underlying litigation expenses *other than*

*attorney's fees*. We thus vacate the portion of the District Court's judgment which prohibits Landowners' counsel from passing litigation expenses on to his clients and remand for further proceedings on this issue, as detailed below in the Conclusion section.

¶70 ***Issue 6. Did the District Court abuse its discretion in denying Landowners damages and fees under 42 U.S.C. §§ 1983 and 1988?***

¶71 In Count 4 of their Amended Complaint, Landowners asserted a claim under 42 U.S.C. § 1983 to vindicate various constitutional and statutory rights. Specifically, they alleged that the City had arbitrarily and illegally taken their property for public use without compensation and due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Article II, Sections 3, 17, and 29 of the Montana Constitution, and § 70-30-101, MCA. Landowners contend on appeal that the District Court abused its discretion by failing to award them damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988, respectively, for the City's alleged violations "of their State and Federal Constitutional rights." We disagree.

¶72 As an initial matter, Landowners are not entitled to damages or attorney's fees under §§ 1983 and 1988 for violations of their rights under state law. *Ybarra v. Bastian*, 647 F.2d 891, 892-93 (9th Cir. 1981). Further, as to Landowners' claims under federal law, the Fifth Amendment's Takings Clause (made applicable to the States through the Fourteenth Amendment, *Dolan v. City of Tigard*, 512 U.S. 374, 383-84, 114 S. Ct. 2309, 2316 (1994)) proscribes not the taking of property, but taking *without just compensation*. *Williamson County Regl. Plan. Commn. v. Hamilton Bank*, 473 U.S. 172, 194, 105 S. Ct. 3108, 3120 (1985). Here, the District Court awarded Landowners just compensation—

including reasonable and necessary attorney's fees, expert-witness fees, and court costs—for the taking of their property. Landowners fail to explain what further compensation the Fifth Amendment's Takings Clause would provide them for the City's physical occupation of their land. *Cf. W. Linn Corp. Park LLC v. City of W. Linn*, 534 F.3d 1091, 1100 (9th Cir. 2008) (if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the federal Takings Clause until the property owner has used the procedure and been *denied* just compensation).

¶73    Finally, regarding the manner in which the City acted, Landowners argued in the District Court that there would be no deterrence against future transgressions unless the City was forced to pay additional damages for civil rights violations. The District Court declined to award such damages, however, because the City "did not act in bad faith in relying on its expert's opinion at the time that the City owned the strips of land at issue," and because "public policy issues weigh against the conclusion that the taxpayers should be held accountable for § 1983 damages under the facts of this case." Landowners have not shown that the District Court's findings are clearly erroneous or that the court abused its discretion in declining to award damages beyond the just compensation required by Article II, Section 29.

## CONCLUSION

¶74    We affirm the District Court on all but two issues. First, having concluded under Issue 3 that the District Court applied an incorrect measure of compensation, we reverse the court's assessment of Landowners' damages for the City's taking of their land and remand for recalculation. The District Court must apply a measure of compensation that

reflects, as closely as possible, the value of Landowners' land at the time it was seized, i.e., in April 2005. In its discretion, the court may accept further evidence on this issue. Second, having concluded under Issue 5 that the District Court erroneously barred Landowners' counsel from passing on to his clients the costs and fees incurred in proving underlying litigation expenses *other than attorney's fees*, we vacate this portion of the court's judgment and remand for a determination of the costs and fees incurred in proving those underlying expenses (which counsel may pass on to his clients).

¶75 Affirmed in part, reversed in part, and remanded for further proceedings.


                                                    /S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ BRIAN MORRIS